This case is People v. Michelle McDonald and we have Mr. O'Neal for the appellate and Ms. Stacey for the athlete. You may proceed, Mr. O'Neal. Thank you, Your Honors. May it please the Court, Counselor. My name is Lawrence O'Neal and I represent Michelle McDonald in this cause. Following a bench trial, Ms. McDonald was found guilty of unlawful financial exploitation of an elderly person, Howard Cruz, who was a 71-year-old man who Ms. McDonald had befriended at church. I intend to address Argument 1 in my presentation here where Ms. McDonald argues that her conviction should be reversed because the evidence did not prove her guilty beyond a reasonable doubt. Ms. McDonald was age 38 and Mr. Cruz had a close personal relationship after they met in church in 1997. Mr. Cruz had no close living relative after his mother died in 2005. Ms. McDonald soon began to help Mr. Cruz with his finances and she began to pay his bills in 2003. Ms. McDonald eventually was appointed Power of Attorney of Property in 2005. There is no question that Ms. McDonald spent a considerable sum of Mr. Cruz's money in various financial transactions over a roughly four-year period beginning in 2005. However, the evidence did not prove an essential element of the offense as charged here, namely that Ms. McDonald obtained control over the property by deception. Ms. McDonald did not need to deceive Mr. Cruz to obtain his assets because Mr. Cruz voluntarily authorized her to spend his money based on her mutual understanding that Ms. McDonald would repay him when she sold her house. What bearing does the fact that there was a doctor apparently that testified that he had early age dementia or Alzheimer's, what bearing does that have on whether or not he agreed to allow her to spend his money? Well, if you're referring to his competency or his knowledge to be able to do this, Your Honors, he did have early age dementia. A doctor said that he was a relatively slow-minded guy. In addition to that? Correct, Your Honors. And apparently his mother had set up a trust fund and she was his guardian in taking care of him? That's correct. But he did testify as a state witness at trial, and that shows that he was competent to testify at trial. And during the course of this four-year period, he executed powers of attorney, which suggests that an attorney at a notary public believed that he had the capacity to have a power of attorney authorizing Ms. McDonald. And he also co-signed a loan during this time period. So there were loan officers, attorneys, the trust executive who conducted financial and legal transactions during this time period with Mr. Cruz, and there's no evidence that they objected to his capability of being able to carry out his transactions. Does that discredit the doctor's testimony? Well, I don't think the doctor testified that Mr. Cruz did not have the mental capacity to conduct… Did he require a guardianship? Did the doctor tell him to get one? Yes, they did have a guardianship. Yes, Your Honor, that was, I believe, in late 2009. Correct.  And certainly he was competent enough to testify at trial. He had the mental capacity to authorize a loan to Ms. McDonald during this time period. The state side's case, People v. Bailey, and it's brief regarding capacity in a situation similar to this. But in that case, the man had severe, he had severe dementia, and he could not conduct any personal activities independently. Mr. Cruz was not bad. He had relationships. He went out shopping. He went to church. And again, considering that he testified at trial, and the loan officers and other bank executives who were involved with transactions he conducted during this time period, I think adequately shows that he was competent enough to know that he had the power and the authority to loan Ms. McDonald money during this time period. They had Mr. Cruz testify at trial, and the most compelling evidence that this was a loan comes from Mr. Cruz's testimony at trial. He repeatedly testified regarding the permission he gave Ms. McDonald to borrow his money. Mr. Cruz testified that he agreed to loan Ms. McDonald money and that he did not care when he repaid her. He did not care what she used the money for. She at one point in his testimony said, she always paid me back. He testified that he did not feel that McDonald deceived him. So in the simplest terms, this was a loan that Mr. Cruz authorized to Ms. McDonald. Ms. McDonald was in financial difficulty, there's no question. They had a close relationship. Ms. McDonald referred to Mr. Cruz as being like a father to her. She took him shopping. They had a very close relationship. It is not out of the bounds of possibility that a 71-year-old man would try to help his friend during her financial difficulties. And there's no evidence that he was deceived into doing that, in addition to the question of whether he had the capacity to do that, which I think the record shows that he does, to make that loan. But there's no evidence of deception. I mean, it may be suspicious that Ms. McDonald was using Mr. Cruz's assets in the way that she did, but we look at the record, there's no evidence of deception. Of course, a conviction cannot be based upon conjecture or guess or supposition. Relative to Your Honor's question about his competency and that he specifically authorized Ms. McDonald to help him with her financial difficulties, there was a loan officer at the bank named Gary Zubminsky. He testified that Cruz co-signed a loan with Ms. McDonald, and in Mr. Zubminsky's opinion, Mr. Cruz seemed very knowledgeable about wanting to help Ms. McDonald. He was fully aware of what he was doing. He was fully aware that he would have to pay the loan if Ms. McDonald defaulted. So, in all, there is no evidence of deception. Now, in the statute, there's a definition of deception, which the court used in analyzing whether the state proved his case. And these factors defining deception were, one, that the person created or confirmed a false impression that he did not believe was true, failed to correct a false impression, which Ms. McDonald had created or confirmed, or third, whether Ms. McDonald prevented Mr. Cruz from acquiring information pertinent to the disposition of his property. And under these definitions, again, Your Honors, there was no evidence that Ms. McDonald created a false impression to Mr. Cruz regarding the transaction. They used transaction loosely. It was an informal agreement. It was informal. Ms. McDonald asked Mr. Cruz if she could borrow some money to make her house payments and to pay some bills, and Mr. Cruz authorized that. There was no false impression. A false impression in this context, in the second factor, would be that Ms. McDonald had no intention of repaying the loan. There was no evidence that she had no intention of repaying the loan. Ms. McDonald's testimony was that he asked, she asked to borrow some money from Mr. Cruz until she had sold her house, and then she would repay him. And Ms. McDonald's house was not in the market for sale. It took quite a while to sell it. She put it on the market in 2007, and she didn't sell it until 2009. And after the house was sold, she began to make payments to Mr. Cruz. There's no evidence that any false impression was created. So, Mr. O'Neill, and I don't, it looks like there were a lot of payments made. Correct, Your Honor. So is it your position that the record will bear out that he was aware of all, I know there was the bank loan and a number of CDs of cash, but other than that, there was money for a four-wheeler that was bought and she got some plastic surgery and a computer that he didn't, we're going to find out that he approved every one of these and was knowledgeable about all these purchases that had nothing to do with him. Well, first regarding the plastic surgery, Mr. Cruz was asked whether he cared that Ms. McDonald spent his money on that. He said no. Now, the record, Your Honor, will not bear out that Mr. Cruz authorized each transaction that Ms. McDonald conducted with the checking account. I didn't think so, but it's kind of your position that he didn't care. He didn't care how she spent his money. Your Honor, he testified that he didn't care. He didn't care. He didn't testify that he didn't care if she paid him back. He didn't care. And that has no, you think his mental state of being in dementia has no bearing on that? Well, Your Honor, I think that the record shows that his mental competency was sufficient to make that loan. Yes. I think that it bears it out. All the other financial legal transactions that he conducted during this time period, he signed powers of attorneys during this time period. Wasn't it even somebody at the bank that initiated the whole investigation? Correct, correct. Because they thought something untoward was going on? Well, correct, Your Honor. It may be suspicious. It is suspicious. But if you look at the cold record regarding proof of deception, you have to show that there was a false impression created and it's not there. I agree that it's suspicious. But on the other hand, it's also possible that he wanted to help a friend through these difficult times. That's a reasonable possibility as well. Thank you, Your Honor. Thank you. We have the opportunity for rebuttal. Ms. O'Neill is thanking. Thank you, Your Honor. Counsel, may it please the Court, my name is Kelly Stacy. I'm here on behalf of the people. This case is about financial exploitation of the elderly. In many respects, Harold was the perfect victim for the defendant. They met at church. The defendant knew that Harold did not own a computer and really lacked the sophistication and knowledge to even understand anything about computers. She knew that Harold had no clue about direct debits from his checking account, and she knew he was a poor reader, that he was confused, and he was lacking in comprehension. The defendant became Harold's agent, which established a fiduciary relationship. A power of attorney for property was executed, naming the defendant as sole agent with no restrictions. But the fact that the document itself had no restrictions does not mean the defendant could indiscriminately burn through all of Harold's money. The defendant argues that all the money that she spent was by agreement, and that Harold never put any limits on any of her spending out of his accounts. But a fiduciary relationship imposes a general duty on the fiduciary to refrain from seeking a selfish benefit during the relationship. There was an agreement here that the defendant could borrow money, but it was not to the tune of $46,000. When the defendant found herself in financial trouble, Harold agreed to co-sign for a $7,500 note for her. Harold was aware that if the defendant defaulted on that, he could be on the hook for up to $7,500. The defendant did wind up declaring bankruptcy, and Harold had to cash in certificates of deposit to cover the remaining balance of that $7,500 note. That was $664. This was the money the defendant borrowed from Harold, and this was the amount he agreed. Harold acknowledged in his testimony that the defendant borrowed money, and indeed she did borrow money. Harold did not loan the money to the defendant, however, without any limitation. He loaned her money to pay for that original debt. The defendant's lavish spending from Harold's accounts was finally discovered when Harold had to cash in annuities to prevent his account from being overdrawn. The defendant got away with this for quite a long period of time because there was enough money in there to cover many of the expenditures she was making. But the bank began guardianship proceedings when things started looking like somebody was taking advantage of Harold. The Visiting Nurse Association opened an investigation. A guardianship proceeding was started, and the very next day after the investigation began with the Visiting Nurse Association, the defendant vowed to begin paying back the money she funneled from Harold's account. The defendant argues that her relationship with Harold was personal, and it was. She argues that the state in its brief tries to limit the authority Harold gave to the defendant, and she implies that all Harold needed to do was put a stop to her spending if he didn't agree with it. There are a few things wrong with this proposition. One, the law imposes a duty on the fiduciary to refrain from seeking a selfish benefit during a relationship. Two, Harold did not authorize the defendant to pay for her own bills through online withdrawals and revolving debits. He had no clue these things were even possible. Thirdly, the defendant argues that it's Harold who should have restrained her by limiting what she was doing with his accounts. This argument flies in the face of the financial exploitation of the elderly statute. Further, it presupposes that Harold had knowledge of what it was she was doing. The trial court found that this was where the bulk of the deception came in. The defendant was using the computer to pay for her purchases from Harold's account, taking advantage of his simple nature and his lack of computer knowledge. All Harold knew was he was now broke, and he needed cash to subsidize his own account. In Harold's limited world view, you pay for things with cash or a check. He knew some people have credit cards and debit cards, but he didn't have any of those, and he didn't use those. He was not aware that the defendant set up a different way to spend his money. He did not know about online spending. The defendant faults her attorney for, in turn, stipulating and then not objecting to bank records that were admitted into evidence. Her argument is not that the statements were inadmissible, but that in absence of a stipulation or an objection, the state would have had to lay proper foundation. This court should reject this argument. The defendant admitted she spent $46,000 from Harold's account over four years. Her argument was not that she never spent the money, but that it was a loan, all of it, $46,000 worth. Trial counsel had the authority to stipulate to the admission of the records, and it was not error for him not to object to those. She stood right by his side the whole time, and it was consistent with her defense. It wasn't ever that I didn't ever borrow $46,000. It was that I did borrow it, and it was with his agreement. The defendant now seems to be arguing that it was the bank statements that showed the degree of her deception because it was a paper trail to what she'd been doing all along. The statements were the footpath to all of these monthly debits for her house payment, the Dell computer, the Verizon bill, the Bank of America, DirecTV, and on and on. The bank statements did not provide the essential element of deception. The computer did. Harold was unable to prevent his own financial exploitation because he did not know it was happening. By the same token, the defendant prevented Harold from discovering it because she was hiding behind the very computer she was having debited to his account. What the defendant did here was wrong. It was illegal, and the fact that Harold was so kind and that after the fact, he didn't seem to care that she had stolen from him does not excuse what she did. The evidence here was sufficient to establish the defendant committed financial exploitation of the elderly. This appears to be a classic case and the exact reason that people who are elderly and in a vulnerable position need to be protected. The people respectfully request your pardon. Thank you, Your Honor. Thank you, Ms. Stacy. Mr. O'Neill, rebuttal. Yes, Your Honor. This may be a classic example of a breach of a fiduciary duty by a power of attorney. I believe this was more of a case for a civil disposition, a civil action. In the context that there's no criminal, my argument, of course, is that there's no evidence that there was criminal deception here. The central element of the criminal statute was not proven because there was no evidence of deception. Now, Ms. McDonald may have breached her fiduciary duty in conducting these transactions and depleting Mr. Pruse's assets. That, I think, is a civil matter. Perhaps the guardian, the trust, should have taken a civil action to recoup the money from Ms. McDonald in that context. But if we're looking at this as a criminal matter and we have a statute that an element of the offense is that there was deception, the record has to prove that there was deception. She depleted the assets, sure. Did she deceive him? Does the record show that she deceived him in doing so? And that's where I contend that there's no evidence of deception, particularly if you look at the definition of deception in the statute, where it has to be evidence of a false impression or a creative false impression or that it withheld information. Now, again, Mr. Pruse did not know of the specific transactions that Ms. McDonald was conducting with his checking account and his credit card. But the evidence does show that Mr. Pruse testified that he authorized her to use the credit card, I believe. I don't want to misrepresent that because Mr. Pruse was a little confused in his testimony. But both Ms. McDonald and Mr. Pruse testified generally that Mr. Pruse knew that Ms. McDonald was using his credit card and was using his checking account for personal matters. They never objected to that. Did he have a credit card? Pardon me, Your Honor? Did he have a credit card? Ms. McDonald obtained a credit card. In his name? Yes. Was that in her name or his name? That was his name, wasn't it? Yes, it was. And she signed? She didn't authorize using it. How did she sign those? Do you know? I don't know. Was there any evidence on that? I don't believe so, Your Honor. Okay. Mr. O'Neill, was there any evidence that, or did your client admit that she knew that he had dementia? I don't recall any evidence of her referring to the doctor's testimony or even knowing that he had dementia. No. I think the evidence, she knew that he was a little bit slow-minded, was dependent upon his mother. But I believe, Your Honor, the record does not reflect that she knew that he had been diagnosed with dementia. For all these reasons, Your Honor, I ask you to reverse Ms. McDonald's conviction. Thank you. Thank you, Mr. O'Neill. Thank you, Ms. Stacy. Thank you for this manner of advisement.